My name is Steve Richard. I represent Max Spatig, who if you ever met him, I think, or anyone who ever met Max would suggest that the term irascible probably fits him quite well, if that's an understatement. As the court is aware, Mr. Spatig was involved in two environmental cleanup incidences on property that he controlled, one in 2005 and one in 2010. We have suggested that the federal prosecution as a result of the cleanup in 2010, that the trial judge erred in determining that the statute involved was not or did not require a specific intent element to it. The court specifically concluded that it was a general intent crime. And we are suggesting to the court that that is error, in part or mostly because the statute requires that Mr. Spatig have knowledge both of the hazardous nature of the material on his property, and secondly, knowledge that the material had become waste. And at trial, Mr. Spatig wanted to approach the issues of his knowledge that he had diminished capacity. The trial judge said, that's not something we're going to get into because this is a general intent crime. So Mr. Spatig was denied his ability to say or have testimony to say that his ability to understand that his materials were hazardous and then became waste, that his mental impairment may not arise to the level of the knowledge requirement under the statute. The second issue that we had approached is sentencing issue, and that is that Mr. Spatig, the trial court added four levels, four offense levels under the guidelines because the cleanup was substantial. And as the court knows, the statute does not describe or define the word substantial. Our suggestion to this court is that the trial court erred simply by determining that there were numerous canisters on his property and that there was some testimony that these canisters could ignite and cause a fire, I suppose. The problem with that is simply counting the number of canisters really doesn't address the substantial nature of the other factors that the statute involves. That would be evacuating the community and those types of issues. There's just a number of canisters and whether or not it could be inflammable. By definition, if it's a hazardous waste or if it is hazardous, that means it either is corrosive or inflammable. So by definition, the judge is using the simple fact that the statute defines these canisters or the materials that could have been in the canisters as inflammable doesn't address whether or not the cleanup costs were substantial. Well, if you leave aside the issue you're talking about in terms of what might happen, whether they might blow up or whatever, we're basically talking about a half million dollars, right? Yes, just short of that. Yeah, just short of a half million dollars. And so your challenge, as I understand it, is that that is not a substantial expenditure for cleanup. Am I correct that that's your argument? I wouldn't put it exactly that way. It is a substantial amount of money. But as far as enhancing a penalty because the cleanup was substantially greater than the run-of-the-mill cleanup, I suggest that any time the EPA contracts with someone to do some type of cleanup, the cost will be substantial. I can't tell you how much, but I think $500,000 to clean up this property was a lot. So you want us to take a comparative approach, but you have no comparators for us? Well, nor did the trial judge. The trial judge looked at just the quantities. He didn't look at what are the relative costs. Well, doesn't that mean that a comparative approach is inappropriate? You just look at the bare dollars. That's more than $36,000, and it is less than a million. But after a while, you are talking about real money when you're dealing with half a million dollars. Well, I agree with that. However, under the statute, the other prongs suggest substantial impact upon the community. Releases of gas or evacuating the community, those are the two actual defined substantial problems. And then the third one here was whether or not this was substantial, and I'm suggesting the money was a lot, but that under the definitions it wasn't substantial compared to what the other prongs under the defined statute suggest. Well, so that's a little bit different argument as I hear it now. You're saying there could be a substantial expenditure of money, but that alone isn't enough to bump it up. You need some other substantial impact. Is that what you're saying? Yes, it is. And how does the text of the guidelines support that reading? Because the guidelines suggest or actually defines those two other elements, particularly the one evacuating the community. So it's defining substantial is the wrong word, defining significant impact on the community, and then here the trial judge appeared to simply look at the number of the canisters. So your real argument is that the dollar figure is not enough to bump it up. That's correct. Okay. And how does that square with the kind of absolutist approach of the guideline, 2Q1.2B3, that says cleanup required a substantial expenditure? That would suggest to me that every cleanup would require a substantial expenditure unless you add something else to it. We know of one that was $32,000, so that wasn't substantial, right? Well, that's a lot of money, so it could have been substantial. But we have case law. Right. So, I mean, if you look at $32,000, $100,000, $200,000, all the various cases, this amount far exceeds any of those where they've been found to be substantial, right? I don't know if I can answer that question. Okay. Do you want to save any time for rebuttal? Sure. Now's a good time to question. All right. May it please the Court, Emily Palachuk on behalf of the United States. Mr. Spadig was convicted under RCRA for knowingly storing or disposing of more than 3,400 containers of hazardous waste on his property that resulted in a cleanup of nearly half a million dollars. Due to his long history of flouting government safety regulations, his bottom-of-the-box guideline sentence included 46 months' imprisonment. This Court should affirm Mr. Spadig's convictions and sentence for the following reasons. First, RCRA is a general intent crime, and under this Court's case law, the diminished capacity doctrine is inapplicable. Second, even if RCRA were a specific intent crime, any error here was harmless. And third, the EPA expended substantial resources to remediate the Rexburg property, justifying the four-level enhancement under the guidelines section 2Q1.2. Can I have you start with the sentencing issue? Sure. In light of the guidelines' plain language, or if cleanup required substantial expenditure, then increase by four levels, I thought counsel was going to make an argument that half a million dollars compared with the run-of-the-mill, six-, seven-figure cleanup isn't sufficient to be substantial. How should the district court approach the determination of what's substantial? By comparing it to the run-of-the-mill case? By taking the high end and the low end and then figuring out whether the dollar amount expended in any particular case falls closer to one range versus the other? Well, this Court's case in the decision in Merino suggested that it should be compared to other cleanups of a similar nature. In Merino, the Court found that $32,000 was not substantial. Here, the amount that we're talking about is more than ten times that much. Looking at other cases in other circuits where this guideline provision has been applied, it seems to run from about $57,000 to $2.5 million. Those are the instances in which the enhancement was applied. So the $500,000 here seems to fall squarely within that range of cases in which the guideline was applied. Additionally, in this case, the district court did look at the language that surrounded the substantial expenditure portion of Section 2Q1.2, which says that the enhancement is proper if the offense resulted in a disruption of public utilities or an evacuation of the community. The Court said that that suggested that there is a community element here. And I'd point out to the Court that in this case, originally, it was the local authorities, the county that came out and tried to take a look and see if they could clean up the mess. They couldn't. So then they went to the regional authorities. They couldn't do it. The state had to call in EPA in order to bring out a team from the state of Washington to clean up the mess here. So as compared to the effect on the community and the number of canisters, as well as the amount of money at issue in this case, this was a substantial expenditure of resources on the part of EPA. So the enhancement here is absolutely proper. The suggestion from the argument I hear is that you have to use kind of a cost-benefit analysis, that yes, it's a lot of money, but what you have to decide is the potential calamity, so great that it justifies the expenditure of that amount of money. Well, what's wrong with that approach? I don't think that there is anything wrong with that approach. I think that that is absolutely what the district court did here. He looked at the type of material that was there, the amount of material. He noted that the commingling of these different types of hazardous material presented a great potential for a toxic threat to the community. He also noted the fact that it wasn't enough for the locals. It wasn't enough for the state. You had to go all the way to EPA in order to remediate this site. What I'm concerned about under that approach, what might be missing, is that they just assumed that there would be toxification of the groundwater, or they assumed that somehow it would evaporate in the air and people would breathe it. But that's an assumption. They didn't say, oh, what is this stuff going to do to vegetation, to animals, to humans? Well, that's not an element of the offense here under RCRA. The government did not have to prove that there was harm to the environment, only the potential for harm to the environment. That's the definition of hazardous that this court adopted. That sounds like it's not a cost benefit. You're saying it's not a cost benefit analysis. Well, but the court here did acknowledge that the commingling of the materials here presented a great risk of a toxic environment to the community. That's in the sentencing hearing, as well as there was testimony at trial. I understand that was recited. But what were the potential toxic consequences? Well, one thing I point out is that many of these materials that were flammable had a very low flash point, as low as 70, I think it was 74 degrees Fahrenheit, and this was well below the temperature that existed in the atmosphere at the time that these materials were cleaned up. Okay. So you were saying is if it continues to sit there, there's an explosive risk. Right. Additionally— I'm not talking about stuff seeping into the groundwater. Well, that's always a risk, as well. If you take a look at the supplemental excerpt of record, the pictures that were taken at the property, you can see that the materials are leaking into the ground. The containers are leaking. These are left out in the open to the elements. Additionally, there was testimony from Mr. Spadig's neighbor, Mr. Herond, that he had a ditch at the border of the property. He usually would burn the ditch every spring to get rid of the shrubbery and such that had grown up in there, and he declined to do that specifically because he saw all of these containers sitting around that had these flammable warnings on them, and so he was concerned that if he were to engage in his normal practices, that he would be creating a substantial risk to his own property, as well as potentially the rest of the community. I'd like to turn to the specific versus general intent issue. This is absolutely a general intent statute. There's no talk of a required intent. All that's required here is knowledge, and the defense is conflating the two terms. General intent simply requires a volitional act, where specific intent requires something more. It's that the defendant acted for a specific purpose, and there was no requirement in this statute that the defendant had to intend any result from his act of storing or disposing of the hazardous waste. This court said in Humphreys that there's no requirement of an intent to dispose, as well as in Evertson, the court said, we have never held that there is an intent to dispose in RCRA. So because it was a general intent statute, the diminished capacity doctrine simply does not apply. Moreover, even if this were a specific intent crime, any error here was more probably harmless than not. The proffered evidence, which all that was offered here was Dr. McGrath's report. It was originally offered for either insanity or diminished capacity purposes, and the court said that from the report, it couldn't be determined that Dr. McGrath's testimony would have been relevant in any way to whether or not Mr. Spaddock had actual knowledge that the material on his property was hazardous waste. As a result, the court offered the defense an opportunity to present Dr. McGrath for voir dire at a later date, but the defense did not take that opportunity. Looking at the report, it's clear that there's nothing that would have been relevant to the issue of the defendant's actual knowledge. The diagnoses presented were personality disorders or temporary disorders, dealing with behavioral and emotional distress. The neurocognitive disorder identified was on the basis of Mr. Spaddock's self-report to Dr. Dagny, and there's nothing in the record that would support the fact that Mr. Spaddock had ever had a stroke. Additionally, the government presented substantial evidence that Mr. Spaddock did, in fact, know that the material on his property was hazardous waste. He'd been told in 2005 that any material on his property that did not have a label, was leaking or corroded, was waste and needed to be disposed of. He was told that both in a letter from the state attorney general's office. He was told in person when state officials came out and assisted him in sorting out which materials he could and could not keep. Additionally, the containers themselves showed Mr. Spaddock that they were hazardous. They contained labels such as flammable, corrosive, oxidizer. Again, the supplemental excerpts of record include pictures that show all of these labels. Additionally, the product itself had gone bad. There are, again, pictures showing that the material had hardened and couldn't be used in any meaningful manner. Mr. Spaddock himself threw them out in the yard along with unusable vehicles and other trash, showing that he believed them to be waste. For these reasons, we'd ask the court to affirm Mr. Spaddock's conviction and sentence. Thank you. I'll start from the sentencing, and I'll quote from the Marino case, which the trial judge quoted at length during sentencing. And the Marino court says, The purpose here is to distinguish some transporting, storage, and other offenses from others according to how much harm they do. That was the standard that the Marino court ultimately determined whether or not a substantial expenditure of government money occurred. What about what was argued that if this fellow goes out and does fall burning, there's a substantial risk there's going to be an explosion because he's burning along this trench and there's flammable materials all around. Actually, we don't know that, Your Honor. I don't think there was any trial testimony. Well, the concern I have when you say we don't know is that the fact that they expend money that prevents a calamity means you're always going to be speculating about what could have happened. No doubt. I agree with that. All right. So there's nothing wrong with reasonable anticipation, or if you want to call it speculation, that's what it is. The testimony at trial suggested that the materials had deteriorated and hardened. I don't know if there was any testimony at trial that I could see, certainly not at sentencing, that suggested those hardened states of the chemicals are as explosive or flammable as they would have been had they not hardened. Well, in the sentencing discussion, the district court talks about this and he said there were vast materials, pictures, huge quantity, but there was concern that they had a toxic component, meaning if they had contact, as Judge Murphy says, with a fire, there was something to ignite them that would cause a significant difficulty. So then the court goes on in light of this magnitude of what was presented at trial plus the money. So it appears that the district court actually took into account not only the potential community harm, but the amount. It's certainly what the transcript says, unless I'm reading it wrong. I read it a little bit differently. All right. I read it that the judge looked at the number of the containers, but I look for support for that conclusion in the trial testimony. He didn't see other than that the chemicals, which originally were in the canisters, could be volatile or could be corrosive. Once they've hardened, and there was no indication how much of these canisters had any liquid in them at all. So at the trial, the judge says, I hear it could be really dangerous. Did you present an actual argument or evidence that there would not be any volatility, that these were basically kind of dead letter toxic waste? I did not, nor did trial counsel. But at sentencing, the government didn't show that either to support the enhancement. Thank you. Thank you both for your argument this morning. United States v. Spadic is sentencing.
judges: Murphy, McKeown, Nguyen